# EXHIBIT 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF OKLAHOMA
 2
     (1) MICHAEL DELONG,
 3
          Plaintiff,
 4
     vs.                        Case No. 5:14-cv-01439-C
 5
     (1) STATE OF OKLAHOMA ex rel THE
 6       OKLAHOMA DEPARTMENT OF MENTAL
         HEALTH AND SUBSTANCE ABUSE
 7       SERVICES;

 8   (2) THE BOARD OF DIRECTORS FOR THE
         OKLAHOMA DEPARTMENT OF MENTAL
 9       HEALTH AND SUBSTANCE ABUSE
         SERVICES, et al.,
10

11        Defendants.

12           DEPOSITION OF MICHAEL LEE DeLONG, II
              Taken on Behalf of the Defendants
13      On December 21, 2015, beginning at 10:00 a.m.
                 In Oklahoma City, Oklahoma
14

15                     APPEARANCES:

16   Appearing on behalf of the PLAINTIFF

17           Rachel L. Bussett
             BUSSETT LAW FIRM, P.C.
18           3555 N.W. 58th Street, Suite 1010
             Oklahoma City, Oklahoma 73112
19           (405) 605-8073
             Rachel@bussettlaw.com
20
     Appearing on behalf of the DEFENDANTS
21
             Victor Albert
22           Matt Warren
             CONNER & WINTERS
23           211 N. Robinson, Suite 1700
             Oklahoma City, Oklahoma 73102
24           (405) 272-5711
             Valbert@cwlaw.com
25           mwarren@cwlaw.com
```



1   you worked for the Department; correct?

2        A    I wouldn't know if they had Kim do

3   something that related to me to do.  I couldn't

4   answer.

5        Q    You received a paycheck or direct deposit

6   from your work for the Department; right?

7        A    Yes.

8        Q    Who was listed as the entity paying you?

9             MS. BUSSETT:  Object to the form.

10            THE WITNESS:  It was direct deposit.  I've

11   never seen it, so I don't know, but I'm sure it was

12   the Department of Mental Health.

13   BY MR. ALBERT:

14        Q    Okay.  Well, the question I'm getting at

15   here is, you have sued the Department of Mental

16   Health claiming it to be your employer.  You've also

17   named the Board of the Department of Mental Health

18   and Substance Abuse Services as a defendant claiming

19   it to be your employer, so what I want to know is

20   all facts that you have as you sit here right now

21   that would support an allegation that the Board of

22   the Department of Mental Health and Substance Abuse

23   Services was ever your direct employer?

24            MS. BUSSETT:  Objection.  Calls for a

25   legal conclusion.



 1    BY MR. ALBERT:

 2         Q     You can answer.

 3         A     I would say yes, because the board runs

 4    the Department.  The board runs Ms. White.

 5    Ms. White runs Kim.  Kim runs me, therefore, it all

 6    flowed downhill.

 7         Q     So when you filled out job applications

 8    following the time that you worked for the

 9    Department, who did you list as your employer?

10         A     Department of Mental Health.

11         Q     Did you ever list the Board?

12         A     They're a part of the Department of Mental

13    Health.

14         Q     Okay.  They're part of the Department by

15    the oversight that they exercise over the

16    Department?

17              MS. BUSSETT:  Object to the form.

18              Is that a question?

19    BY MR. ALBERT:

20         Q     Yes.

21         A     Repeat that, please.

22         Q     How is the Board a part of the Department?

23         A     I feel the Board runs the Department.  The

24    Board runs leadership.  Leadership runs the

25    Department, so they're part of the Department.



 1  one of those things.

 2      Q    Yeah.  So you agree that you were on the

 3  outside looking in.  You don't know what experience

 4  she had with HR issues when she was a lawyer for the

 5  Department; correct?

 6      A    Yeah.

 7      Q    Okay.  Can you point to any specific

 8  comment that Durant Crosby ever made where he said

 9  that he was favoring somebody because they had a law

10  degree?

11      A    Durand wouldn't say that.  He's too smart.

12      Q    Okay.  So that's another

13  outside-looking-in assessment; right?

14      A    That's just looking at functions of the

15  Department, so, yeah.

16      Q    All right.  So then let's get back and

17  talk about this situation involving Dewayne Moore

18  and Robin Wilson.

19          What happened to that relationship?

20          MS. BUSSETT:  Object to the form.

21  BY MR. ALBERT:

22      Q    Do you know?

23      A    What are you asking?  What happened to it

24  as in?

25      Q    What's the status of their relationship

1    today? Do you know?

2         A      I think they're married.

3         Q    Okay.  At any point in time did Robin

4    Wilson ever voice to you a complaint about the

5    relationship with Dewayne Moore?

6         A    No.

7         Q    At any point in time did Dewayne Moore

8    ever voice to you a complaint about the relationship

9    with Robin Wilson?

10        A    No.

11        Q    At any point in time did you ever hear

12   from Kim Poff that Robin Wilson had voiced to her a

13   complaint about the relationship that Robin was

14   having with Dewayne?

15        A    No.

16        Q    At any point in time did you ever hear

17   from Kim Poff that Dewayne Moore had voiced some

18   problem that he had with the relationship with Robin

19   Wilson?

20        A    No.

21        Q    At that point in time, did the Department

22   have any policy against employees having a

23   consensual relationship with each other?

24        A      I don't believe so.

25        Q    Did you ever know Kim Poff to have a



1      Q    Okay.  So, as you sit here right now, you

2  can't remember any specifics about that?

3      A    No.

4      Q    Okay.  You mentioned the word "hostile"

5  environment.

6      A    Uh-huh.

7      Q    And you worked in the environment because

8  you had an office there; right?

9      A    Yes.

10     Q    Okay.  So tell me when you first became

11  aware that Dewayne Moore and Robin Wilson had a

12  relationship outside of work.

13     A    Well, I just -- I started noticing

14  different changes amongst them.  Just, you know, he

15  would treat her a little bit different, was a lot

16  nicer with her, and they would spend a lot more time

17  together, doing more cases together.  Started

18  seeing, like, Hannah and Allen kind of distancing

19  themselves.  Neil, he was the administrative

20  assistant for both of them, you know, was just --

21  you could tell he was having a rough time with it,

22  but I believe Neil was the one that mentioned

23  something, because he was upset one day, and he was,

24  like, "You know, I'm really upset that, you know,

25  Dewayne is treating me like I am."  And he was,



1  like, "Yeah, because he's messing around with

2  Robin," and I was, like, "Oh, really?"

3          So he kind of gave me a little bit of a

4  spiel upon that.

5      Q    When was that?

6      A    I couldn't tell you.  Before all this even

7  happened.

8      Q    Well, was it before the anonymous letter?

9      A    Oh, yeah.  It was way before that.

10     Q    Okay.  So this was sometime before

11 April 22nd of 2013?

12     A    Yes.  It would be before that.

13     Q    Okay.

14     A    I don't know if it was two or three months

15 or six months.  I couldn't tell you, but I know it

16 was before that.

17     Q    So what do you remember Neil saying to

18 you?

19     A    I remember him just being upset because

20 Robin would lose things and he would get blamed for

21 losing it, and Dewayne would get onto him for losing

22 stuff that Robin didn't do, and it just really upset

23 him because, you know, he feels that that wouldn't

24 happen if he wasn't, you know, messing around with

25 her.



1    investigated, it's quite possible that it's going to

2    be a confirmed finding," so...

3        Q    So Kim said that to you?

4        A    Yeah.

5        Q    So she's telling you, after getting this

6    letter, that if the Dewayne Moore situation was

7    looked into, she felt like there would be a finding

8    that he was at fault?

9        A    Yeah.  It was based on what she knew about

10   the whole situation.

11       Q    Okay.  And what do you understand that she

12   knew about the whole situation?

13            MS. BUSSETT:  Object to form.

14            THE WITNESS:  Well, just pretty much what

15   everybody knew.  I mean, you have, you know, a

16   third-party person, you know, Hannah, you know,

17   that's feeling kind of discriminated against.  This

18   Robin character gets a new position, gets moved out

19   of the office to this job that nobody had an

20   opportunity to apply for, and already was feeling,

21   you know, just discriminated against just because

22   she wasn't the one in this relationship.

23            And so just knowing that, knowing what

24   we've seen, you know, any investigator after

25   reviewing all the facts and looking into them would



1        Q    Do you understand that you're under the

2    same oath and the same instructions we did the first

3    half of the deposition on; right?

4        A    Yes.

5        Q    Okay.  When we took the break, we were

6    talking about your allegation of retaliation.  Okay?

7    Remember that?

8        A    Yes.

9        Q    All right.  Now, in your official job

10    assignment as the investigator, one of the

11    investigators for the Department, was the

12    investigation of complaints of sexual harassment

13    something that you did in the course and scope of

14    your employment?

15        A    Yes.

16        Q    Okay.  And so you did that job as a

17    regular part of your daily job responsibilities?

18        A    Yes.

19            (Exhibit 9 marked for identification)

20    BY MR. ALBERT:

21        Q    All right.  Now, if you would, please,

22    turn to Exhibit 9, and within that document, or

23    within that exhibit, is page 74, if you would.

24            MS. BUSSETT:  Are you referring to Bates

25    No. 74?



1        MR. ALBERT:  Yes.

2   BY MR. ALBERT:

3        Q    So it looks like this.  Okay?  It's

4   Exhibit 9.  Look down here at the bottom, and

5   there's a Bates label, and this is Bates label

6   No. 74.  Okay.

7            Now, did you ever file an EEOC Charge of

8   Discrimination against the Department prior to your

9   termination?

10       A    I don't believe so.

11       Q    Okay.  And, particularly, did you ever

12  file an EEOC Charge of Discrimination against the

13  Department for anything to do with the Dewayne

14  Moore/Robin Wilson situation prior to your

15  termination?

16       A    My attorney completed the paperwork and

17  stuff, so it would be --

18       Q    No, no.  Don't look at that for now.

19            My question is:  Prior to the date that

20  you were terminated from employment, August the

21  23rd, 2013, had you ever gone to the EEOC and filled

22  out an EEOC Charge of Discrimination against the

23  Department for anything to do with the Dewayne

24  Moore/Robin Wilson situation?

25            MS. BUSSETT:  Object to the form.



1          Can I ask for a clarification?  Are you

2    asking on his behalf or on behalf of an employee?

3    BY MR. ALBERT:

4        Q     On your behalf.

5        A     No.

6        Q     And then the related question that your

7    counsel just asked for clarification on.

8          Prior to August the 23rd, 2013, when you

9    were terminated from employment, had you ever gone

10   to the EEOC with anyone to assist that person in

11   filling out a Charge of Discrimination?

12       A     I don't believe so.

13       Q     Okay.  Now, I want to direct your

14   attention to this document we were talking about,

15   page 74.  Does that look like your signature on that

16   document?

17       A     It's not my signature; however, I gave my

18   attorney verbal permission to sign the form for me.

19       Q     Okay.  So had you reviewed this form

20   before you signed it?

21       A     Yes.

22       Q     All right.  Did you write this form?

23       A     I assisted in the writing of it.

24       Q     Okay.  Did you have the opportunity to

25   make changes to this before it was signed by your

1    counsel, Dewayne Moore."

2              So what I would like to know is the

3    details that support that statement.

4              First, I want to know:  You say that you

5    were investigating and reporting third-party sexual

6    harassment claims involving Department general

7    counsel, Dewayne Moore.

8              Who's sexual harassment claims were you

9    investigating and reporting?

10        A    When Hannah came to me on several

11   occasions, she would, you know, make complaints

12   about Dewayne and his relationship with -- and Robin

13   and how it was affecting her.  When she would do

14   that, I would definitely report it over to the

15   inspector general, who would then, you know, do her

16   thing on that side.

17             So we didn't know if we were going to open

18   up a case or not just yet.  We were, like, in limbo

19   in the process of, you know, what we're going to do,

20   how the Department is going to handle it, so,

21   basically, during that situation, I was just

22   reporting the information that I was being received

23   from the third party.

24        Q    Okay.  So you were not actually

25   investigating anything at that point; correct?



1      A     Nothing was assigned, no.

2      Q     Okay.  So you were not investigating;

3   correct?

4      A     Nothing was assigned, no.

5      Q     Okay.  And my point was:  Had you done

6   anything to investigate?

7      A     I just would report what was coming to me

8   to my supervisor.

9      Q     And so what you're saying is, anything

10   Hannah would say to you, you would simply pass that

11   information over to your supervisor, Kim Poff?

12      A     Yes.

13      Q     You did nothing to corroborate it or

14   follow up on it or interview witnesses about it?

15      A     No.  There wasn't a case opened yet.

16      Q     Okay.  So it was part of your normal daily

17   job duties to do exactly what you did, which was:

18   Whatever information you received from Hannah Cable,

19   to pass it over to your supervisor, Kim Poff?

20      A     That's what I felt was right.

21      Q     Okay.  And that was part of your normal

22   daily job responsibilities to do that?

23      A     Yeah.  If a complaint came in, I would

24   pass it on to the supervisor and have her make a

25   decision on what to do at that point, so when she



1    would complain, I would report it to Kim, and she

2    was in the process of making the decision she was to

3    deal with this.

4        Q    I'm sorry.  I missed the last part of

5    that.  She was in the process of what?

6        A    I'm trying to think how I said it.

7        Q    Okay.  The part I got was, you said --

8             MS. BUSSETT:  I'm sorry.

9             MR. ALBERT:  That's fine.

10   BY MR. ALBERT:

11       Q    -- you would get the information and then

12   you would pass it over to Kim Poff?

13       A    Yes.

14       Q    Okay.  That was what you did on all

15   investigations that you investigated?

16       A    In high profile situations like that, if I

17   received information that, you know, wasn't a case

18   opened or anything, then, yeah, I would let her

19   know, you know.  Anyone that's going to make a

20   complaint, I'm going to have to act upon, even if

21   it's an official complaint or unofficial, and so

22   when it would come in, you know, I'm obligated to

23   inform Kim and tell her about the information so she

24   could pass it on to what she needed to do.

25       Q    And you're obligated to do that why?



1       A     Well, because someone made a complaint.  I
2    have to pass it to somebody.  I just can't sit on
3    it.
4       Q     What I'm getting at is:  You're obligated
5    to do that because that's what your job requires?
6       A     Yes.
7       Q     Okay.  So did you view the things that
8    Hannah was saying to you to be unofficial
9    complaints?
10      A     It was a complaint.  Whether it was
11   official or unofficial in her capacity is her
12   decision, but when I was told about it, you know, I
13   took a stance like it was a complaint, so I reported
14   it to my supervisor.
15      Q     Okay.  Now, did you ever take anything
16   that Hannah said to you and report that to anyone
17   other than Kim Poff?
18      A     No.
19      Q     All right.  So then you never took
20   anything that Hannah said to you and reported it to
21   the EEOC directly?
22      A     No.
23      Q     So you treated it as part of the internal
24   process?
25      A     Yes.



1        Q    Okay.  So, again, that would be something

2    else that enured to her benefit out of this; right?

3            MS. BUSSETT:  Object to form.

4            THE WITNESS:  More money is always a

5    benefit, yeah.

6    BY MR. ALBERT:

7        Q    Okay.  Do you know whether or not that

8    position that Robin Wilson was ultimately put in

9    paid more than the position that Robin Wilson had

10   been in prior to that?

11       A    No idea.

12       Q    All right.  Do you know who made the

13   decision to move Robin Wilson to that position?

14       A    No.

15       Q    Do you know why that decision was made?

16       A    Not officially.

17       Q    Okay.  All you would know would be what

18   you have assumed of the situation as an outsider

19   looking in?

20       A    That's right.

21       Q    And no one ever told you why that decision

22   was made?

23       A    No.

24       Q    What did you say back to Hannah about that

25   particular fact, about Robin Wilson getting that



1    position?

2        A    Mainly, my role was just try to calm her,

3    because she was pretty upset, you know, give her

4    options that, "You know, if you want to file a

5    complaint, you can file on a third party if you want

6    to officially do something."

7            And she was, like, "No, I don't want to

8    officially do anything," because, you know, she was

9    scared to go up against Dewayne because that would

10   mean she would go up against Durand, which means

11   pretty much you're going to lose your job

12   automatically.

13       Q    Did she say that to you?

14       A    Yeah.  She, you know, didn't want to

15   ruffle any feathers.  She was scared she would get

16   terminated.

17       Q    Did Hannah ever file any EEOC Charge of

18   Discrimination?

19       A    Not to my knowledge, no.

20       Q    Now, you say that there was an occasion

21   where -- so just to be clear on that point, you

22   specifically advised Hannah that her options

23   included bringing a formal Charge of Discrimination

24   against the Department if she felt like she had been

25   discriminated against on that?



1  kind of giggled about it?

2      A    Yeah.  Humorous.

3      Q    Okay.  So then you took it from her saying

4  that, and then you kind of giggling about it, that

5  that was appropriate and acceptable, at least to

6  Hannah, for you to have that reaction to it?

7          MS. BUSSETT:  Object to form.

8          THE WITNESS:  I don't understand what

9  you're asking.

10 BY MR. ALBERT:

11     Q    Well, I've seen some reference here to a

12 hostile work environment.

13     A    Uh-huh.

14     Q    What was hostile about the work

15 environment?

16     A    I think just the way that people were

17 being treated, the way Dewayne was treating Neil,

18 the way Hannah was being treated, the way the other

19 attorney, Allen, felt.  You know, he was not able to

20 get stuff done because Robin wasn't getting her

21 stuff done, which Dewayne was allowing Robin not to

22 do, and just a big circle of hate and discontent

23 amongst the attorneys for a while.

24     Q    Okay.  Did you ever hear any improper

25 sexual comments made by Dewayne Moore?



1      A    No.

2      Q    Did you ever hear any improper sexual

3    comments made by Robin Wilson?

4      A    No.

5      Q    Did Dewayne and Robin ever talk about sex

6    in front of people in the department?

7      A    Not in front of me.

8      Q    Did you ever hear from Hannah a complaint

9    that they had done that in front of her?

10     A    No.

11     Q    Neil?

12     A    No.

13     Q    Allen?

14     A    No.

15     Q    Kim?

16     A    No.

17     Q    Anyone?

18     A    No one's told me that they did.

19     Q    Okay.  Did Dewayne visibly flirt with

20   Robin in the workplace, that you saw?

21     A    Yeah.

22     Q    Okay.  Did he ever physically touch her in

23   the workplace, that you saw?

24     A    Not that I can recall at this time.

25     Q    Did you ever hear anyone else in the



```
 1   workplace talk about sexual innuendo, like Hannah

 2   did when she referenced blow jobs?

 3        A     No, I don't believe so at this time.

 4        Q     You said that Hannah suspected that maybe

 5   Robin got a raise.  You don't know that to be true,

 6   do you?

 7        A     No.

 8        Q     Do you know what job assignments Hannah

 9   had at the time?

10        A     No.

11        Q     Do you know what job assignments Robin

12   Wilson had at the time?

13        A     No.

14        Q     So you have no way to objectively judge

15   whether or not Hannah was being disfavored in her

16   work assignments; correct?

17        A     Just that she felt she was.

18        Q     Okay.  But you can't assess that?

19        A     (Witness shakes head side to side)

20        Q     In terms of -- you said something about

21   outings that she got to go on.  There again, can you

22   objectively assess whether or not Robin got to go on

23   better outings than Hannah did?

24        A     Yeah.  I mean, they would definitely go to

25   conferences together, go different places.  Pretty
```



1    much did everything together while Hannah was in the

2    office, so I felt that she was going to better

3    places.

4          Q    Okay.  But, again, that was something

5    Hannah felt?

6          A    Uh-huh.

7          Q    Yes?

8          A    Yeah, Hannah felt that.

9          Q    Who was there first as an employee in the

10   legal department, Robin or Hannah?

11         A    Hannah.

12         Q    Do you know where Robin came from?

13         A    Cleveland County somewhere.

14         Q    Now, back to this page 74 in Exhibit 9,

15   which is your statement to the EEOC.  "I believe I

16   was retaliated against for investigating and

17   reporting third-party sexual harassment claims."

18              We've established that you weren't

19   investigating anything at that time; right?

20              MS. BUSSETT:  Object to form.

21   BY MR. ALBERT:

22         Q    Right?

23         A    That is correct.

24         Q    Okay.  And as far as reporting, the only

25   person you ever relayed the information to was Kim



1    Poff, and that was pursuant to your normal job

2    duties; right?

3         A    I was reporting sexual harassment to Kim

4    Poff.

5         Q    You were reporting what Hannah said to

6    you; right?

7         A    Her complaints to me, I was reporting it

8    to Kim, yes.

9         Q    Now, you can't, because you've had no

10   legal training, sit here and say that that situation

11   as to Hannah was actually sexual harassment, can

12   you?

13             MS. BUSSETT:  Object to the form.

14             THE WITNESS:  One more time?

15   BY MR. ALBERT:

16        Q    You don't have any legal training to be

17   able to say the fact that Dewayne had a relationship

18   with Robin was sexual harassment to Hannah; right?

19        A    I would say through the civil rights

20   classes that I attended and were certified from,

21   that it's a possibility it could have been qualified

22   as third-party sexual harassment.

23        Q    And how is that?

24        A    Just based on the relationship they had in

25   the office was interfering with Hannah's job and her

1    function and just think she was being treated

2    unfairly.

3        Q    Can you give me any specifics about a

4    seminar or a class that you took where that was

5    covered?

6        A    I can't give you the date, but when I was

7    certified as a civil rights investigator, sexual

8    harassment was a five-day class that I had to attend

9    where you went over that type of information.

10       Q    Okay.  Who put on that class?

11       A    The State of Oklahoma.

12       Q    And what year was it?  What job were you

13   in?

14       A    I was with the Department of Mental

15   Health.

16       Q    So after 2010?

17       A    Oh, yeah.  It was after 2010.

18       Q    Where was that class?

19       A    It was in Oklahoma City.  I can't recall

20   the building or the street or the name of it.

21       Q    Did you keep any of the materials from

22   that class?

23       A    I believe it was in my desk.

24       Q    So you don't have it now?

25       A    Well, I don't have anything from my desk.



1    Q    All right.  Back to page 74.  Your

2  statement to the EEOC.  The next sentence.  "It was

3  well known that Mr. Moore was involved in an

4  extramarital affair with one of his subordinate

5  co-workers."

6            What do you have to base the statement

7  that it was an extramarital affair?  Strike that.

8            Let me ask it this way:  At the time that

9  you found out that Dewayne Moore and Robin Wilson

10  had a relationship more than just work, was Dewayne

11  Moore married?

12    A    I don't remember.

13    Q    Okay.  So when you made that statement to

14  the EEOC, you weren't sure that it was an

15  extramarital affair, were you?

16    A    I don't remember, no.

17    Q    Okay.  You don't know whether he was

18  married or divorced at the time; right?

19    A    That's correct.

20    Q    All right.  And the subordinate co-worker

21  you're talking about here, that's Robin Wilson;

22  right?

23    A    I believe so.

24    Q    So the next sentence.  "Prior to my

25  termination, I was in the process of initiating a



1    sexual harassment claim made by another subordinate

2    of Mr. Moore's."

3         Who is that?

4    A    I don't remember at this time.

5    Q    Well, what do you remember about him that

6    you can give us any details on?

7    A    I just don't remember the statement the

8    way it's worded.  I don't remember what I was

9    meaning at that point.

10   Q    So other than Hannah Cable, is there

11   anyone else who ever made a statement to you about

12   the situation that you relayed to Kim Poff as a

13   statement critical of Dewayne Moore from a sexual

14   harassment standpoint?

15   A    Just, you know, some of the statements

16   Allen would make about the relationship and him not

17   being able to get stuff done.  There was those.  And

18   then --

19   Q    What statements would Allen make to you?

20   A    Well, just, you know, he can't get nothing

21   done.  He's so busy.  Has all these cases.  He's

22   doing everything because, you know, Robin is not

23   holding her own.  They're too busy, you know,

24   running off with their relationship.

25   Q    Anything else?



1  you made to the EEOC.  As you sit here right now,

2  under oath, giving your testimony to me, you cannot

3  give me any facts to support the sentence, "Prior to

4  my termination, I was in the process of initiating a

5  sexual harassment claim made by another subordinate

6  of Mr. Moore's"; correct?

7           MS. BUSSETT:  Object to the question.  It

8  misstates the testimony.

9  BY MR. ALBERT:

10      Q    Well, then let me ask it this way so I

11  don't misstate your testimony.

12           That sentence right there, "Prior to my

13  termination, I was in the process of initiating a

14  sexual harassment claim made by another subordinate

15  of Mr. Moore's."  Give me the name of that person as

16  you sit here right now.

17      A    Like I said earlier, I can't remember.

18  Can't remember writing it or -- I can't.

19      Q    Okay.  Can you give me any of the facts or

20  details about that?

21      A    No.

22      Q    Can you tell me when that was told to you?

23      A    I don't remember.

24      Q    So whatever was involved with that, would

25  you have done anything more with it other than



1          A      Uh-huh.

2          Q      Correct?

3          A      Yes.

4          Q      All right.  Anyone else?  No?

5          A      Well, like I mentioned, the only

6     individuals that would ever, you know, complain to

7     me was Neil, Hannah, and Allen, and we've talked

8     about all three of them.

9          Q      Okay.  You were never asked by Neil to

10    initiate a sexual harassment claim, were you?

11         A      No.

12         Q      You were never asked by Allen to initiate

13    a sexual harassment claim, were you?

14         A      No.

15         Q      In this regard, did you ever step outside

16    your role as an investigator and employee for the

17    Department in anything you did?

18         A      No.

19         Q      So everything you did in this regard was

20    within the scope of your job duties for the

21    Department; correct?

22         A      I believe so.

23         Q      And just to be clear on this, did you ever

24    see that a file was opened up by Kim Poff or anyone

25    at the Department to investigate the matter?



```
 1        A    Like a file was opened up to investigate
 2   the sexual harassment?
 3        Q    Yes.
 4        A    I've never seen a file.
 5        Q    Did you ever see a file number, a case
 6   number?
 7        A    No.
 8        Q    Did you ever see it on an inspector
 9   general's report?
10        A    No.
11        Q    Okay.  So when I read your complaint to
12   the EEOC that we have in this letter, that's the
13   only matter dealing with sexual harassment that I
14   read or see.
15             Is there any other matter dealing with
16   sexual harassment besides the Dewayne Moore/Robin
17   Wilson situation that you are involving in the
18   retaliation claim in this lawsuit?
19        A    Not that I can remember at this time.
20        Q    Okay.  Now, I want you to turn back a few
21   pages to page 69, still within that same Exhibit 9,
22   if you would, please.
23             Now, at the top of this document is
24   entitled "Memorandum of Conversation."  Do you see
25   that?
```



1    communication by Jason Maddox?

2         A    Not in the office, no.

3         Q    Well, was he there when you made a

4    decision to go over and interview Chris Flanagan at

5    Shepherd Mall?

6         A    We talked about it, yeah.

7         Q    All right.  So getting back to my original

8    question on this line, then, do you recall anyone

9    else being in Kim Poff's office when you learned

10   about Chris Flanagan was going to cover this

11   presentation?

12        A    No.

13        Q    All right.  So what happened next, in

14   terms of planning to go get with Chris Flanagan

15   about this?

16        A    What do you mean, "What happens next"?

17        Q    Well, when's the next time it's discussed

18   in your offices on 13th Street?

19        A    I don't think it really was discussed

20   after that.

21        Q    So do you remember a series of discussions

22   that involved you, Jason, Allen, and Hannah that

23   morning before you went over there?

24        A    I don't remember Allen.  I don't even

25   remember that morning.  I remember at one point me

1   and Jason were having lunch in the little board room

2   area, and he was talking about it and joking around

3   about it.  I was standing in the back of the room,

4   you know, and staring at him and stuff, and he was

5   laughing -- laughing and, "Okay.  Whatever."  And

6   Hannah walked in and Jason looked over at her and

7   said, "Oh, guess what we're going to go do," and

8   mentioned that, and told Hannah it was a joke.

9   That's what we meant.  And she walked out.

10          As far as Allen -- I don't remember ever

11  mentioning anything like that to Allen, you know, or

12  anything, but there was a joking conversation where

13  that was stated.

14       Q    Okay.  So there was just the one

15  conversation?

16       A    Just the one I remember.

17       Q    And you're saying it was not the morning

18  that you went to Shepherd Mall and did your NEO

19  presentation and interviewed Chris Flanagan?

20       A    No, because it was during, like, a lunch

21  conversation I had with Jason, so we had lunch at

22  NEO, so it wasn't that day.

23       Q    So this was a lunch conversation that you

24  had over in your offices over on 13th Street?

25       A    Yes.



1    came up.

2         Q    Did it come up because there was a

3    discussion about Jill Amos being upset and calling

4    Kim Poff and telling Kim Poff she was upset about

5    it, and then maybe some conversation about how to

6    intimidate Chris Flanagan?

7              MS. BUSSETT:  Objection to the form.

8    Calls for speculation.

9              THE WITNESS:  Gosh, I don't remember it

10   coming up like that.

11   BY MR. ALBERT:

12        Q    Okay.  So you and Jason are joking around.

13   So you don't remember how the topic came up at that

14   time at lunch with you and Jason?

15        A    No.  The only part that even helps me

16   vaguely remember that is I remember Hannah coming in

17   and Jason stating, "Hey, we're going to go do this,"

18   and knowing Hannah, you know, she's --

19        Q    Wait a minute.  Wait a minute.  Before you

20   move on.  So now you're saying that you didn't say,

21   "We're going to go stand in the back of the room

22   when Chris Flanagan is doing the NEO presentation."

23   You're saying that Jason said that to Hannah?

24        A    I'm saying we talked about it, and as we

25   were talking about it, Hannah came in the room.



1    Q    So it would be improper for you to have

2    intended to go to the New Employee Orientation that

3    he was presenting at and stand in the back of the

4    room in an effort to intimidate him?

5         A    Yes.

6         Q    And so you're saying you didn't do

7    anything like that?

8         A    No.

9         Q    Now, did you ever have any conversation

10   with Allen about any of this joking around?

11        A    I don't remember having one with him.

12        Q    Let me just ask you some specific things.

13             Do you remember Hannah saying to you,

14   "That's not a good idea.  You shouldn't do that," to

15   you?

16        A    Yes.  I remember her saying that to me and

17   Jason in the break room, and that's when I said,

18   "That's not what we're doing."

19        Q    Okay.  Do you remember Allen saying

20   anything like that to you and Jason, that you

21   shouldn't even go over there today?

22        A    I don't remember that.

23        Q    All right.  Do you remember saying to

24   Jason, "Oh, come on.  Get your coat, we're going"?

25        A    No.



```
 1   third room, in the back, a little bit to the left,
 2   which put them off into the corner.
 3        Q    "Them" who?
 4        A    Chris, the people attending the NEO.
 5        Q    Okay.  But he was in the middle of his
 6   presentation?
 7        A    I believe so, yes.
 8        Q    So was he on a stage?
 9        A    No.  He was just walking around.
10        Q    Okay.  Walking around talking?
11        A    Uh-huh.
12        Q    Okay.  Looking around the room?
13        A    Yes.
14        Q    Now, I haven't met Chris.  Size-wise, how
15   does he compare to you?
16        A    He's probably 5-10, 150-ish, maybe.
17        Q    Smaller?
18        A    Yeah.
19        Q    How were you dressed?
20        A    Probably in a suit.
21        Q    How was he dressed?
22        A    I couldn't answer you.  I don't remember.
23        Q    Okay.  So you walk up to him in the
24   hallway, and what did you say to him at that point?
25        A    I was in the hallway and waiting on him to
```



1  leave, and when he came out of the room, like I said

2  all the doors were closed.  I said, "I need to talk

3  to you," and he was, like, "Okay."

4       Q    Okay.  And then you get over to the room

5  where you're going to interview him.  Pick it up

6  from there and tell us what happened.

7       A    Just sat down and we started talking,

8  asked him the questions I needed to.  You know, he

9  gave me his explanation of what happened during all

10  that.  He was really grateful for talking with me,

11  thanked me several times before he left, and then he

12  left.

13       Q    So did he provide to you the information

14  you needed?

15       A    Yes.

16       Q    And did you ever raise your tone with him?

17       A    I don't think I did.

18       Q    Did you find that he had committed

19  violations regarding the complaints you were looking

20  into?

21       A    Yes.

22       Q    Did you tell him that you were going to

23  find that?

24       A    No, I don't believe so.

25       Q    Did he ever tell you that he would own up

